Filed 7/6/26  P. v. Rampal CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE, | D085628 |
| Plaintiff and Respondent, | (Super. Ct. No. SCS331725) |
| v. | |
| RAMAN RAMPAL, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of San Diego County, Garry G. Haehnle, Judge.  Affirmed.

Richard Schwartzberg, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Charles C. Ragland, Chief Assistant Attorney General, Arlene A. Sevidal, Assistant Attorney General, Daniel Rogers, Adrian R. Contreras, and Sharon L. Rhodes, Deputy Attorneys General, for Plaintiff and Respondent.

Raman Rampal appeals from a judgment after a jury verdict finding him guilty of being a felon in possession of a firearm (count 1) and

1

ammunition (count 2).  (Pen. Code,[1] §§ 29800, subd. (a)(1) & 30305, subd. (a)(1).)  In a bifurcated proceeding, Rampal admitted he had a prior serious felony conviction for making criminal threats (§ 422) and that he was on probation at the time he committed the crime.  The charging document alleged that the prior conviction qualified as a strike prior.  (§§ 667, subds. (b)-(i), 668, & 1170.12.)  The trial court found that Rampal had waived his right to a jury trial on the prior strike allegation and sentenced Rampal on count 1 to a two-year midterm, doubled to four years because of the prior strike.  The court stayed his sentence on count 2.

Rampal contends that the trial court prejudicially erred by precluding cross-examination regarding the victim's application for a U visa.  He also argues that his admission of the prior strike allegation was not knowing, intelligent, and voluntary, which requires reversal.  We affirm the judgment.

FACTUAL AND PROCEDURAL BACKGROUND

## A. *The Truck Incident*

In June 2024, B.C. was working as a semitruck driver and arrived in the early morning at a warehouse in San Ysidro, California, to deliver a load of cheese.  He was not scheduled to make the delivery until later that afternoon, so while he waited to dock at the warehouse, he parked on an adjacent street and slept in a bed in the truck's cabin.

B.C. woke up around 9:00 a.m. when he heard someone knocking on the passenger side door.  He opened the door and saw Rampal, who stepped up and put his hands on the passenger seat.  B.C. had never seen or met Rampal before.  B.C. sat down on the driver's side, and Rampal said, "They're not going to receive your load" because the truck's "reefer" (or refrigeration) is

---

[1]    Undesignated statutory references are to the Penal Code.

"off, and you need it on a minus ten." Rampal asked B.C. to show him the load's documents. B.C., a native Spanish speaker, told Rampal that he "didn't understand what [Rampal] was saying." Rampal then asked B.C. twice to show him his phone. After B.C. repeated that he could not understand him, Rampal lowered his right hand to his waist. When Rampal raised his hand again, he was holding a 9-millimeter gun pointed downward. B.C. was familiar with handguns from being in the military and recognized the size of the hole in the barrel. B.C. took out the documents for the load and showed them to Rampal, who "stared at" B.C. before stepping down from the truck. Rampal then proceeded to get into a semitruck parked next to B.C. and drive away.

B.C. took a picture of Rampal's truck as it drove away and called the police soon after. One of the responding officers who arrived at the scene observed that B.C. was "really distressed," "crying really hard," and "fearful." B.C. described the gun to law enforcement as being black with a "brownish" slider, and at trial he said the handle was between "dark brown" and "yellow" in color. After seeing the picture B.C. took of the back of Rampal's truck, an officer shared the truck's description with other officers who located Rampal near the warehouse and detained him. Rampal told officers he did not have any handguns in his truck and consented to a search. An officer found a loaded 9-millimeter handgun in some blankets on a bed in the truck's cabin. The officer also found a bag of loose ammunition inside a cracker box stored in a cabinet, and brass knuckles between the windshield and dashboard.

After Rampal was arrested and detained, a jail officer conducting an unscheduled search of Rampal's cell found about 0.35 grams of methamphetamine in a pair of rolled-up socks.

3

## B. Trial Court Proceedings

The People charged Rampal with possession of a firearm by a felon (§ 29800, subd. (a)(1)), possession of ammunition by a prohibited person (§ 30305, subd. (a)(1)), possession of metal knuckles (§ 21810), and possession of a controlled substance in jail (§ 4573.6). The People alleged that Rampal had suffered a strike prior (§§ 667, subd. (b)-(i), 1170.12, & 668) in 2023 for making criminal threats (§ 422), a serious or violent felony. The amended information also alleged aggravating factors, including that Rampal was armed with a firearm during the commission of the offense (Cal. Rules of Court, rule 4.421(a)(2)) and that he was on probation when the crime was committed (*id*., rule 4.421(b)(4)).

At a pre-trial hearing in early December 2024, the trial court granted the defense's request to bifurcate the trial as to the alleged prior strike and aggravating factors. After the court gave defense counsel time to consult with Rampal, counsel told the court that Rampal would "waive jury on the aggravating factor . . . [a]nd the strike prior," and that they would enter into a stipulation with the prosecution. Defense counsel acknowledged that he had received a copy of the amended information filed the same day as the hearing and that Rampal had been "previously advised of his constitutional rights and the charges and aggravating factors."

During trial, the prosecution informed the court that B.C. had just submitted a U visa application—which defense counsel described as a "crime victim's visa"—and was requesting certification from the District Attorney's office. The next day, the parties' counsel said they had both spoken with B.C. and stipulated to putting a summary of their discussion on the record rather

4

than conducting an Evidence Code section 402[2] hearing. The parties represented that B.C. has had an immigration attorney for the past 30 years and is currently in the country on a work visa. B.C. learned about the existence of a U visa four or five years before the incident, but he did not know how to qualify for it or any specifics about the visa, except that it was more "secure." B.C. said he did not talk to his lawyer about obtaining a U visa until after he had spoken to his friends about the incident with Rampal.

The defense sought the court's permission to cross-examine B.C. about when he learned about the U visa and his understanding of what it is. Defense counsel argued that the evidence was relevant to B.C.'s credibility and motivations for his testimony and comments to police officers. The prosecution argued that although B.C.'s credibility was relevant, the evidence had limited probative value because B.C. did not know how to qualify for a U visa until after the incident. The prosecution also contended that any probative value was outweighed by its prejudicial effect under Evidence Code section 352. The court found that any evidence of B.C.'s limited knowledge about U visas before the incident had "very little, if any" probative value and precluded the evidence.

After the prosecution presented its case, the court read a stipulation between the parties into the record stating that Rampal was previously

---

[2]   Evidence Code section 402 provides in relevant part that a court "may hear and determine the question of the admissibility of evidence out of the presence or hearing of the jury."

5

convicted of a felony in 2023 and was a person prohibited from possessing and acquiring a firearm or ammunition.[3]

Rampal then testified in his own defense. He had been a truck driver for four years working for his brother's company. He said that there are many others who drive the same semitruck he was driving the day of the incident, including "Mexicans," "black people," and "whites." He had driven the truck from Fresno to San Diego over the course of two days, but he did not sleep in the bed in the truck cabin during that time because the bed was "very dirty." He opted to rest in the front seat for an hour or two instead. He saw B.C. at the dock next to his on the night they both arrived in San Diego. The next morning on his way to the warehouse to drop off his load, Rampal noticed that the refrigeration on B.C.'s truck was "off" even though the temperature was "supposed to be minus ten." According to Rampal, if the temperature was not correct the warehouse would not accept B.C.'s load, so he knocked on the door of B.C.'s truck. He said he went to tell B.C. about the refrigeration issue because truck drivers "help each other." Rampal denied having a firearm with him when he spoke to B.C. and said he simply went back to his truck after he saw B.C.'s paperwork.

As for the methamphetamine, Rampal said he had roommates in his jail cell the day of the unannounced search, but they had just moved out earlier that morning. Rampal borrowed some rolled up socks from his cellmates so he could put his feet up at night to reduce swelling. He denied knowing there was methamphetamine in the socks.

---

[3]    Although the jury was not told anything about the underlying facts of the prior conviction, the record reflects that it involved a 2022 assault with a firearm on another commercial truck driver in a parking lot, including threats to kill the victim.

## C. *Verdict and Post-Trial Proceedings*

After deliberating for a little more than half a day, the jury found Rampal guilty of possession of a firearm by a felon and possession of ammunition by a prohibited person. The jury found Rampal not guilty of possessing metal knuckles and possessing a controlled substance in jail.

After receiving the jury's verdicts, the trial court asked the defense how it would like to address the strike prior and aggravating circumstances allegations. Defense counsel informed the court that Rampal "said that he would admit his strike prior and . . . one of the aggravating factors" relating to being on probation at the time of the offense. After hearing argument from the prosecution about the other aggravating factor of being armed with a firearm, the court found that the allegation was not proven beyond a reasonable doubt and struck that factor. The court then addressed Rampal as follows:

> "Now as to the strike prior. Mr. Rampal, it's alleged that on June 13th, 2023, in case No. F22904924, in the county of Fresno, State of California, you were convicted of a charge, Penal Code Section 422, criminal threats, which is a serious or violent felony under California law. Do you understand that that's what you're being alleged to have been charged with and convicted of?"

Rampal responded, "Yes." The court then asked, "And do you admit that you have that charge and you were convicted of that charge on that date in that courtroom?" Rampal again responded, "Yes." The court then found that Rampal had "previously waived his right to a jury trial on that" and accepted Rampal's admission, finding that it was "freely and voluntarily made, and [Rampal] understands the nature of the charge – the strike, the consequences thereof[.]" At the end of the hearing, the court also found that Rampal had waived his right to a jury trial on the alleged probation aggravating factor

7

and asked if Rampal admitted the allegation was true.  Rampal responded, "Yes."

At a subsequent hearing in February 2025, the court denied the defense's request under *Romero*[4] to strike Rampal's strike prior.  The court denied probation and sentenced Rampal to a midterm of two years, doubled to four years for the strike prior, as to each of counts 1 and 2.  The court stayed the sentence for count 2.

DISCUSSION

I

Rampal's first argument on appeal is that the trial court prejudicially erred by excluding testimony regarding B.C.'s U visa application under Evidence Code section 352.  We disagree.

"We review claims regarding a trial court's ruling on the admissibility of evidence for abuse of discretion.  [Citations.]  Specifically, we will not disturb [a] trial court's ruling 'except on a showing the trial court exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice.' " (*People v. Goldsmith* (2014) 59 Cal.4th 258, 266; Evid. Code, § 353.)

A party may impeach or discredit a witness during cross-examination by " 'revealing possible biases, prejudices, or ulterior motives of the witness.' [Citation.]  'The partiality of a witness is subject to exploration at trial, and is "always relevant as discrediting the witness and affecting the weight of his testimony." ' [Citation.]  [¶]  However, the right to cross-examine a witness . . . isn't absolute[] [and] '[a] trial court may restrict defense cross-examination of an adverse witness on the grounds stated in Evidence Code

---

4       *People v. Superior Court* (*Romero*) (1996) 13 Cal.4th 497.

section 352.' [Citations.]" (*People v. Villa* (2020) 55 Cal.App.5th 1042, 1051 (*Villa*).)  Evidence Code section 352 gives the trial court discretion to "exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury."  (Evid. Code, § 352.)  Trial courts have broad latitude under Evidence Code section 352 to exclude such impeachment evidence.  (*Villa*, at p. 1051.)

We conclude that the trial court reasonably found that B.C.'s knowledge of the mere existence of a U visa four to five years before the incident, even as a more "secure" visa, had minimal relevance to his credibility without any evidence he knew about how to qualify for one.  A U visa allows a non-citizen to remain temporarily in the United States based on their status as a victim of certain crimes if they assist law enforcement with the investigation or prosecution of the offense.  (*People v. Castaneda-Prado* (2023) 94 Cal.App.5th 1260, 1267, fn. 1 (*Castaneda-Prado*); *Villa, supra*, 55 Cal.App.5th at p. 1050; see 8 U.S.C. § 1101 et seq., as amended by Pub.L. No. 99-603 (Nov. 6, 1986) 100 Stat. 3359; 8 U.S.C. § 1101(a)(15)(U).)  B.C. did not learn that he could qualify for a U visa until after he shared the details of the incident with friends.  It is unclear how B.C. could be motivated to fabricate a story making himself out to be a victim of a crime if he did not yet know how doing so would help him obtain a U visa.  Moreover, B.C. waited several months after the incident to apply for a U visa, which is consistent with his representation that he only realized he could qualify for one after his friends prompted him to pursue the option.  Without any evidence that B.C. knew the requirements for a U visa in advance of the incident involving B.C., it had little probative value to support a theory that

he spontaneously fabricated the claim that B.C. had a gun and called the police immediately after the incident occurred solely to qualify for a U visa.

The fact that other evidence corroborated B.C.'s account also supports the trial court's finding that the U visa evidence would have minimal probative value. Police found a gun matching B.C.'s description in Rampal's truck before Rampal even left the area. Rampal was the only person who had driven the truck in the days leading to the incident, and he did not deny that he had approached B.C. to tell him about his truck's refrigeration and then asked for load documentation. B.C. and Rampal had never met before the incident, and there was no evidence that B.C. had any reason to know Rampal had a gun in his truck other than from seeing it in Rampal's hand. B.C.'s testimony was largely consistent with what he told law enforcement at the scene, despite minor inconsistencies in the description of the gun's coloring.

Lastly, the court did not abuse its discretion in determining that the risk of prejudice in admitting the evidence outweighed any limited probative value. In addition to needing expert testimony to educate the jury about U visas and how someone can qualify for one, the parties may have decided to put on additional witnesses—such as B.C.'s immigration attorney or the friends he talked to—to testify about how much B.C. knew about U visas and when. (See *Villa, supra*, 55 Cal.App.5th at p. 1053 [no abuse of discretion where admitting U visa evidence could "take a huge chunk of time" because "parties would reasonably have sought to put on additional witnesses to testify about when [the victim] learned about the U visa program" and to educate jurors about the program].) There was also a risk that jurors might draw negative inferences about B.C.'s own immigration status upon learning that he was present in the country on a work visa. (See *Id*. at p. 1054 ["This

10

concern is precisely the reason Evidence Code section 351.4 limits evidence of a person's immigration status in criminal trials."].)  Weighed against the evidence's questionable relevance, the court acted within its broad discretion by concluding that testimony about B.C.'s U visa application would be unduly prejudicial.

The court's decision in *Villa*, which addressed the admissibility of U visa evidence, supports our conclusion.  The defendant in *Villa* argued that the trial court erred by excluding evidence that the domestic abuse victim had applied for a U visa after testifying at the preliminary hearing.  (*Villa, supra*, 55 Cal.App.5th at pp. 1044, 1048.)  The victim had learned about the U visa program at a shelter, went to the prosecutor's office to inquire about the process of obtaining a U visa, and understood that to qualify for the visa, she had to be considered a victim of domestic violence.  (*Id*. at p. 1048.)  The Court of Appeal concluded that although the evidence was relevant for impeachment purposes, the trial court did not abuse its discretion because the minimal probative value of the evidence was "easily outweighed by the potential for wasted time and jury confusion."  (*Id*. at pp. 1044–1045.)

Rampal argues that *Villa* is distinguishable because B.C. knew about the existence of U visas before the offense.  Rampal also contends B.C. is more like the victim in *Castaneda-Prado*.  In that case, the defendant was convicted of molesting two minor victims.  (*Castaneda-Prado, supra*, 94 Cal.App.5th at pp. 1266–1267.)  Citing *Villa*, the trial court in *Castaneda-Prado* excluded one victim's preliminary hearing testimony that she filed a declaration accusing the defendant of sexual abuse to assist her mother in obtaining a U visa.  (*Castaneda-Prado*, at pp. 1271, 1275.)  The Court of Appeal reversed the defendant's conviction, relying on the fact that the victim *admitted* she was motivated by potential U visa benefits when she first gave

11

a sworn statement accusing the defendant of abuse.  (*Id.* at pp. 1286, 1288.)
The court observed that because of that admission, there was less risk of
undue consumption of time because no inquiry into U visa procedures was
necessary—"[w]hat mattered most was that [the victim] apparently believed
she was furthering her mother's interest in obtaining a U visa by giving
damaging testimony" about the defendant.  (*Id.* at p. 1288.)  The court also
noted that the prosecution's case turned almost entirely on the victim's
credibility given the lack of corroborating evidence, and that the victim's
testimony had grown more detailed and more incriminating over time.  (*Id.*
at pp. 1287–1288.)

Here, unlike the victim in *Castaneda-Prado* and like the victim in
*Villa*, there is no evidence that B.C. knew about the requirements for a
U visa, or had any reason to know that being the victim of a crime could
make him eligible, *before* the incident.  Moreover, unlike in *Castaneda-Prado*,
B.C.'s description of events did not get more detailed and more incriminating
over time.  In fact, his testimony at trial about the gun's color weakened the
prosecution's case because it was somewhat inconsistent with what he
initially reported to law enforcement.

For these reasons, we conclude that the trial court did not exercise its
discretion in an arbitrary, capricious, or patently absurd manner when it
excluded testimony about B.C.'s U visa application.

## II

Rampal next contends that his admission of the prior strike allegation
was not knowing, intelligent, and voluntary because the trial court did not
advise him of his rights under *In re Tahl* (1969) 1 Cal.3d 122 and *Boykin v.
Alabama* (1969) 395 U.S. 238, commonly referred to as a defendant's *Boykin-*

12

*Tahl* rights.[5]  (See *People v. Mosby* (2004) 33 Cal.4th 353, 360 (*Mosby*).)  We disagree.

Before accepting a criminal defendant's admission of a prior conviction, the trial court must "advise the defendant and obtain waivers of (1) the right to a trial to determine the fact of the prior conviction, (2) the right to remain silent, and (3) the right to confront adverse witnesses.  [Citation.]  Proper advisement and waivers of these rights in the record establish a defendant's voluntary and intelligent admission of the prior conviction."  (*Mosby, supra*, 33 Cal.4th at p. 356.)  The failure to provide these advisements, however, does not warrant automatic reversal.  "[I]f the transcript does not reveal complete advisements and waivers, the reviewing court must examine the record of 'the entire proceeding' to assess whether the defendant's admission of the prior conviction was intelligent and voluntary in light of the totality of circumstances."  (*Id.* at p. 361.)

We conclude that although the trial court's advisements were incomplete, the totality of the circumstances demonstrates Rampal knowingly, intelligently, and voluntarily waived his *Boykin-Tahl* rights. At Rampal's arraignment on the original complaint, which included the strike prior, the court advised him of his constitutional rights and he signed an acknowledgement of advisal of constitutional rights form.  During

---

5    Rampal makes conclusory statements in his opening brief about the lack of an advisal regarding the consequences of his admission.  But Rampal presents no legal argument or authority on the issue and does not meaningfully develop this claim.  We may and do disregard conclusory arguments not supported by pertinent legal authority or reasoning.  (*United Grand Corp. v. Malibu Hillbillies, LLC* (2019) 36 Cal.App.5th 142, 153; *Nickell v. Matlock* (2012) 206 Cal.App.4th 934, 947 [where no evidence or authority is cited to support conclusory assertions, the argument is forfeited].)

arraignment on the information, Rampal was present when his counsel informed the court he had "been previously advised of his constitutional rights, the pending charges and consequences."

Before the trial began, the court gave defense counsel time to consult with Rampal "about how he want[ed] to proceed with the prior and the aggravating factors" alleged in the complaint. After a 15-minute recess, defense counsel returned and represented to the court that Rampal would "waive jury on the aggravating factor . . . [a]nd the strike prior." Rampal was present in court when defense counsel made this statement. Defense counsel then acknowledged that he had received a copy of the amended information and that Rampal had been "previously advised of his constitutional rights and the charges and aggravating factors." The record therefore reflects that Rampal was aware of his right to jury trial on the strike prior, he had an opportunity to discuss it with his counsel, and he elected to waive the right to jury trial on this allegation.

Rampal was also present in court when the parties stipulated he had suffered a prior felony conviction in 2023, and he personally admitted the prior in his own trial testimony. This was the same prior that was alleged as the strike prior. Rampal presumably understood there was little point in contesting a prior conviction he had already stipulated to and admitted in his trial testimony.[6]

By the time Rampal admitted his strike prior, he had just undergone a jury trial represented by counsel who confronted witnesses on Rampal's behalf, and Rampal was thus aware of his confrontation rights. (*Mosby,*

---

[6]  Rampal's 2023 conviction for making criminal threats (§ 422) was a qualifying serious felony prior under the Three Strikes law. (§ 1192.7, subd. (c)(38).)

*supra*, 33 Cal.4th at pp. 364–365.)  And before his admission, defense counsel informed the court that Rampal "said that he would admit his strike prior" and the probation aggravating factor, but not the other aggravating factor. The fact that Rampal elected to contest one aggravating factor but not the other aggravating factor or the strike prior indicates he made a knowing and intelligent choice to admit the strike prior he had already admitted in his trial testimony and stipulated to at trial.  Moreover, the trial court also twice referenced Rampal's waiver of his right to a jury trial after the jury returned verdicts: first as to his prior conviction, and again on the probation aggravating factor.  Neither Rampal nor his counsel objected or corrected the court at either time.

Lastly, as the California Supreme Court observed in *Mosby*, " 'a defendant's prior experience with the criminal justice system' " is " 'relevant to the question [of] whether he knowingly waived constitutional rights' " because previous experience with the criminal justice system means a defendant likely has " ' "knowledge and sophistication regarding his [legal] rights." ' " (*Mosby, supra*, 33 Cal.4th at p. 365, quoting *Parke v. Raley* (1992) 506 U.S. 20, 36–37.)  Here, the 2023 strike prior was a conviction by guilty plea.  Rampal would have been advised of his constitutional rights when he pled guilty on that case. (*Mosby*, at p. 365.)  He also had another prior felony conviction in 2023 and a misdemeanor conviction in 2021.  When considering the forgoing circumstances in their totality, we conclude Rampal's admission of his prior strike was knowing, voluntary, and intelligent.

15

## DISPOSITION

The judgment is affirmed.


BUCHANAN, J.

WE CONCUR:


McCONNELL, P. J.


CASTILLO, J.